RODGERS, U. S. Immigration Com'r et al., v. UNITED STATES ex rel. BUCHSBAUM.

(Circuit Court of Appeals, Third Circuit. February 13, 1907.)

No. 39.

1. ALIENS—IMMIGRATION LAWS—FINALITY OF DECISION OF BOARD OF SPECIAL INQUIRY.

Under the Immigration Act of March 3, 1903, c. 1012, 32 Stat. 1213 [U. S. Comp. St. Supp. 1905, p. 274], and rule 7 of the regulations established thereunder by the Secretary of Commerce and Labor, an immigrant who on examination by a board of special inquiry has been denied the right to enter the United States has the right to be informed that he has a right of appeal therefrom, and the fact that he has been so informed must be entered of record in the minutes of the board's proceedings, and the withholding of that right precludes finality in the decision of the board which may in such case be reviewed by the courts on a writ of habeas corpus.

2. SAME—ALIENS DOMICILED IN THE UNITED STATES—RIGHT TO RE-ENTER.

An alien, who has acquired a domicile in the United States, cannot thereafter, and while still retaining such domicile, legally be treated as an immigrant on his return to this country after a temporary absence for a specific purpose not involving change of domicile.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 2, Aliens, § 105.]

**3. Same—Construction of Statute.**

 The provision of section 2, Act March 3, 1903, c. 1012, 32 Stat. 1214 [U. S. Comp. St. Supp. 1905, p. 276], which excludes from admission into the United States "aliens" who are afflicted with a loathsome, or with a dangerous contagious, disease, cannot be construed to apply to aliens who are domiciled in this country, especially in view of the title of the act, which is "An act to regulate the immigration of aliens into the United States," and of its other provisions and prior statutes in pari materia.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

J. C. Swartley and J. Whitaker Thompson, for appellants.
David Phillips, for appellee.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

BRADFORD, District Judge. This is an appeal from an order of the district court of the United States for the eastern district of Pennsylvania discharging Isidore Buchsbaum on a writ of habeas corpus from alleged illegal restraint by John J. S. Rodgers, United States commissioner of immigration, and others. In his petition for the writ Buchsbaum alleges in substance that he is a native of Austria and emigrated to the United States, arriving in the city of New York with his wife and family March 10, 1901; that thereupon "he took up a permanent residence with his wife and family in said city and established himself in the window cleaning business, in which he still retains his interests"; that from the time of his arrival in New York until April, 1905, he continuously resided in that city with his family, "pursuing his aforesaid business and acquiring extensive contractual property and rights"; that he declared his intention March 8, 1905, before the circuit court of the United States for the southern district of New York to become a citizen of the United States; that in April, 1905, he "took passage on the Steamer Finland for Antwerp, and thither went to Galicia, Austria, for the purpose of settling an estate"; that in leaving this country for that purpose he "never intended to give up his rights which he had acquired in the United States, but went with the intention of returning as soon as his business was transacted"; that his family "consisting of wife and two children remained in New York and are still residing there"; that he returned to the United States arriving in Boston as a passenger on the steamer Marquette November 7, 1905; that the United States commissioner of immigration at Boston "refused him a landing and on November 9, 1905, ordered his deportation on the ground that he was afflicted with trachoma"; that the petitioner "was not given a lawful opportunity to appeal" by the commissioner and was conveyed on the Marquette to Philadelphia where he arrived November 19, 1905, and "is now illegally restrained of his liberty and illegally held in custody" in a house of detention in that city; that he is a resident of New York and never gave up his residence there; and that he "was not afflicted with any disease when he left New York City, nor when he left Europe on his return trip to the United States, and if he has any disease such as alleged, he must have contracted the same on board the Steamer Marquette on his return to

the United States." In the return of the International Mercantile
Marine Company, Young and Johnston, to the writ it is alleged in
substance that the master of the Marquette was notified November 17,
1905, by the commissioner of immigration at Boston that Buchsbaum
"had been found to be of the class of aliens prohibited by law from
entering the United States and had therefore been excluded," and was
required by the commissioner "to receive the said alien on board his
vessel and return him according to law"; and, further, that the master
received Buchsbaum and took him on the Marquette to Philadelphia
whence she was about to sail for Antwerp when the writ was served.
It appears from the transcript of record that on the arrival of Buchs-
baum at Boston in November, 1905, he was subjected to a physical ex-
amination by medical officers of the United States marine-hospital
service who certified to the commissioner of immigration that Buchs-
baum "has trachoma and the existence of such disease might have
been detected by means of a competent medical examination at the port
of foreign embarkation." A board of special inquiry, provided for
in the act of Congress of March 3, 1903, entitled "An act to regulate
the immigration of aliens into the United States" (Act March 3, 1903,
c. 1012, 32 Stat. pt. 1, 1213 [U. S. Comp. St. Supp. 1905, p. 274]),
having heard the case, decided that Buchsbaum was, under the pro-
visions of the act, debarred from admission into the country by reason
of trachoma and having reheard the case adhered to its former deci-
sion. Section 25 of the act provides relative to boards of special
inquiry:

"Such boards shall have authority to determine whether an alien who has
been duly held shall be allowed to land or be deported."

And further:

"The decision of any two members of a board shall prevail and be final, but
either the alien or any dissenting member of said board may appeal, through
the commissioner of immigration at the port of arrival and the Commissioner-
General of Immigration, to the Secretary of the Treasury, whose decision shall
then be final; and the taking of such appeal shall operate to stay any action
in regard to the final disposal of the alien whose case is so appealed until the
receipt by the commissioner of immigration at the port of arrival of such de-
cision."

Section 22 provides:

"That the Commissioner-General of Immigration * * * shall establish
such rules and regulations * * * not inconsistent with law, as he shall
deem best calculated for carrying out the provisions of this Act and for pro-
tecting the United States and aliens migrating thereto from fraud and loss,
* * * all under the direction or with the approval of the Secretary of the
Treasury."

By virtue of the act of February 14, 1903, entitled "An act to estab-
lish the Department of Commerce and Labor" (Act Feb. 14, 1903, c.
552, 32 Stat. pt. 1, 825 [U. S. Comp. St. Supp. 1905, p. 63]), the Secre-
tary of Commerce and Labor has succeeded to the powers, duties and
functions of the Secretary of the Treasury, relating to the "immigration
service at large." Pursuant to the foregoing authority the Commis-
sioner-General of Immigration with the approval of the Secretary of

Commerce and Labor established "Immigration Regulations," August 26, 1903. Rule 7 of these regulations is as follows:

"Every alien arriving at a port of the United States shall be promptly examined, as by law provided, either on shipboard or at some other place designated for that purpose. If found admissible, he shall be at once landed, but if upon special inquiry he is denied admission, he shall be informed that he has a right of appeal therefrom, and the fact that he 'has been so informed shall be entered of record in the minutes of the board's proceedings, but no appeal will be considered after any such alien has, in consequence of an adverse decision of a board of special inquiry, been transferred from an immigrant station to be deported."

The transcript of record sets forth what purports to be a copy of the minutes of the proceedings and of the testimony before the board of special inquiry at Boston. This copy by agreement of counsel was treated as evidence in the court below. It nowhere discloses expressly or by implication that Buchsbaum was informed that he had a right of appeal from the decision of the board. If he had been so informed it would have been the duty of the board to cause the fact to be entered of record in the minutes of the board's proceedings. There is no denial by the appellants or any of them of the truth of the averment made by Buchsbaum in his petition for the writ of habeas corpus that "he was not given a lawful opportunity to appeal" from the decision against him in Boston. Under these circumstances it fairly may be presumed that Buchsbaum was not informed of his right of appeal. He was not allowed to land in the port of Boston, but, with intent that he should be deported, was conveyed from that port on the Marquette to Philadelphia, whence she was about to sail for Antwerp, when the writ of habeas corpus was served. The action of the authorities in thus sending Buchsbaum from the port of Boston without informing him of his right of appeal was irregular and unlawful. Practically, and in legal contemplation, it impaired or deprived him of that right. For rule 7 of the regulations, as we have seen, provides that:

"No appeal will be considered after any such alien has, in consequence of an adverse decision of a board of special inquiry, been transferred from an immigration station to be deported."

And such a limitation is in harmony with and required by the statutory provision that:

"The taking of such appeal shall operate to stay any action in regard to the final disposal of the alien whose case is so appealed until the receipt by the commissioner of immigration at the port of arrival of such decision."

The law has coupled the finality of a decision against an alien by a board of special inquiry with a right to appeal and to be informed of that right. The withholding of such right from the alien of itself precludes finality in the decision. And as the decision thereby lacks finality it is, and in the nature of things must be, competent to courts otherwise possessing jurisdiction to inquire by the writ of habeas corpus into the legality of the detention of the alien.

The question is thus presented whether Buchsbaum was, under the act of March 3, 1903, liable to deportation; and this was the only point considered by the court below. Section 2 provides that "persons afflicted with a loathsome or with a dangerous contagious disease" and who

are aliens "shall be excluded from admission into the United States," and section 19 provides for the deportation of "aliens brought into this country in violation of law." The evidence shows beyond dispute ·that on his arrival in the United States in March, 1901, with his family and children, he made his home in New York; that he had his domicil and conducted his business in that city for years; that he has never since establishing himself and his family in New York changed or intended to change his domicil; that in March, 1905, he declared his intention to become a citizen of the United States; that in going abroad in April, 1905, he went for a specific purpose involving only a temporary absence; and that he left in New York his business and his family with full intention to return to them as soon as he should have accomplished the object of his trip. The return of Buchsbaum from Austria to this country in November, 1905, did not clothe him with the character of an immigrant. He did not at that time seek to acquire a fixed residence or domicil in ·the United States. That had theretofore been accomplished. We are clearly of opinion that an alien who has acquired a domicil in the United States cannot thereafter and while still retaining such domicil legally be treated as an immigrant on his return to this country after a temporary absence for a specific purpose not involving change of domicil. The term "immigrant" as applied to him is a palpable misnomer. If the act of March 3, 1903, had expressly been restricted to alien immigrants no substantial question could have arisen on this branch of the case. But there is no such express limitation. Section 2 provides that "the following classes of aliens shall be excluded from admission into the United States"; and mentions, in the enumeration of those classes, ."persons afflicted with a loathsome or with a dangerous contagious disease." The language of the section when taken literally is applicable to persons so diseased whether they are at the time of reaching the port of arrival alien immigrants or aliens whose domicil is in the United States. We think, however, that, notwithstanding the generality of the terms employed in the section, Congress did not intend that exclusion under the act on account of loathsome or dangerous contagious disease should extend to aliens domiciled in this country. In reaching this result the body of the act has been considered in its entirety in connection with its title, and in the light of other statutes in pari materia. The title is·"An act to regulate the immigration of aliens into the United States." Certainly, if taken alone, it would indicate the inapplicability of the act to the case of Buchsbaum. It is well settled that, where the language of a statute is ambiguous or otherwise doubtful or, being plain, a literal construction would lead to such absurdity, hardship or injustice, as to render it irrational to impute to the law making power a purpose to produce or permit such result the title may be resorted to as tending to throw light upon the legislative intent as to its scope and operation. United States v. Fisher, 2 Cranch. 358, 386, 2 L. Ed. 304; Holy Trinity Church v. United States, 143 U. S. 457, 462, 12 Sup. Ct. 511, 36 L. Ed. 226; Coosaw Mining Co. v. South Carolina, 144 U. S. 550, 563, 12 Sup. Ct. 689, 36 L. Ed. 537. Further, the body of the act contains provisions of such a character as, in connection with the title, to lead us to conclude that the statute was-not intended to apply to aliens having their homes in the United States. Section 12 provides:

"That upon the arrival of any alien by water at any port within the United States it shall be the duty of the master or commanding officer of the steamer, sailing or other vessel, having said alien on board to deliver to the immigration officers at the port of arrival lists or manifests made at the time and place of embarkation of such alien on board such steamer or vessel, which shall, in answer to questions at the top of said lists, state as to each alien the full name, age, and sex; whether married or single; the calling or occupation; whether able to read or write; the nationality; the race; the last residence; the seaport for landing in the United States; the final destination, if any, beyond the port of landing; whether having a ticket through to such final destination; whether the alien has paid his own passage, or whether it has been paid by any other person or by any corporation, society, municipality or government, and if so, by whom; whether in possession of fifty dollars, and if less, how much; whether going to join a relative or friend, and if so, what relative or friend and his name and complete address," &c.

Section 13 provides:

"That all aliens arriving by water at the ports of the United States shall be listed in convenient groups, and no one list or manifest shall contain more than thirty names. To each alien or head of a family shall be given a ticket on which shall be written his name, a number or letter designating the list in which his name, and so forth, is contained, and his number on said list, for convenience of identification on arrival. Each list or manifest shall be verified by the signature and the oath or affirmation of the master or commanding officer or the first or second below him in command, taken before an immigration officer at the port of arrival, to the effect that he has caused the surgeon of said vessel sailing therewith to make a physical and oral examination of each of said aliens, and that from the report of said surgeon and from his own investigation he believes that no one of said aliens is an idiot," &c.

Section 16 provides:

"That upon the receipt by the immigration officers at any port of arrival of the lists or manifests of aliens provided for in sections twelve, thirteen, and fourteen of this Act it shall be the duty of said officers to go or send competent assistants to the vessels to which said lists or manifests refer and there inspect all such aliens, or said immigration officers may order a temporary removal of such aliens for examination at a designated time and place, but such temporary removal shall not be considered a landing, nor shall it relieve the transportation lines," &c.

Section 17 provides for the "physical and mental examination of all arriving aliens" by the proper medical officers or surgeons "who shall certify for the information of the immigration officers and the boards of special inquiry * * * any and all physical and mental defects or diseases" observed by them in any such alien. Section 18 provides:

"That it shall be the duty of the owners, officers and agents of any vessel bringing an alien to the United States to adopt due precautions to prevent the landing of any such alien from such vessel at any time or place other than that designated by the immigration officers," &c.

To apply these and other provisions in the act, solely on account of temporary absence from the United States on business or pleasure, to aliens domiciled in this country, many of whom have here had their homes and families for years, carried on business and acquired wealth and distinction, and have while here received equally with citizens protection of person and property, would, we think, not only create repugnancy between the body of the act and its title, but require a harshness of construction or interpretation never contemplated by Congress. A review of some of the earlier statutes and decisions

touching the immigration or importation into this country of aliens other than Chinese will throw much light on the subject under consideration. We say "other than Chinese" because cases arising under the Chinese exclusion acts are sui generis, involving the judicial or administrative enforcement of a particular policy on the part of the United States having as its object the prevention of competition between Chinese labor and other labor in this country. There, contrary to the general rules of evidence, prima facie presumptions are indulged against the Chinaman, and it may be that the principles of statutory construction properly may be applied to the Chinese exclusion acts in a manner somewhat different from that in which they are applicable to the act of March 3, 1903, and other statutes in pari materia. The act of February 26, 1885, entitled "An act to prohibit the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States, its Territories, and the District of Columbia" (Act Feb. 26, 1885, c. 164, 23 Stat. 332 [U. S. Comp. St. 1901, p. 1290]), made it "unlawful * * * in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States, its Territories, or the District of Columbia, under contract or agreement, parol or special, express or implied, made previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States, its Territories, or the District of Columbia." It further declared that all such contracts or agreements should be utterly void and provided penalties for violations of the act. Aliens belonging to certain enumerated classes, to which it is unnecessary to refer in this connection, were excepted from the prohibition of the act. The act nowhere mentioned "alien immigrants" and "immigrants" or either of them. It was amended February 23, 1887 (Act Feb. 23, 1887, c. 220, 24 Stat. 414 [U. S. Comp. St. 1901, p. 1293]), by the addition of several sections, which, among other things, provided that:

"All persons included in the prohibition in this act, upon arrival shall be sent back to the nations to which they belong and from whence they came."

The amendatory act did not mention "alien immigrants" or "immigrants." It was amended by the appropriation act of October 19, 1888 (25 Stat. 565, 566, c. 1210 [U. S. Comp. St. 1901, p. 1294]), which contained the following provision:

"That the act approved February twenty-third, eighteen hundred and eighty-seven, entitled 'An act to amend an act to prohibit the importation and immigration of foreigners and aliens under contract or agreement to perform labor in the United States, its Territories, and the District of Columbia,' be, and the same is hereby, so amended as to authorize the Secretary of the Treasury, in case he shall be satisfied that an immigrant has been allowed to land contrary to the prohibition of that law, to cause such immigrant within the period of one year after landing or entry, to be taken into custody and returned to the country from whence he came, at the expense of the owner of the importing vessel, or, if he entered from an adjoining country, at the expense of the person previously contracting for the services."

This provision amounted, we think, to a legislative declaration or, at least, recognition that the act of February 26, 1885, and the amendatory act of February 23, 1887, notwithstanding the use of the terms "aliens"

and "foreigners," were intended to exclude only alien immigrants. For the latter act, as has appeared, provided that all persons included in the prohibition upon arrival "shall be sent back to the nations to which they belong and from whence they came"; and it would be unreasonable and incongruous to assume that by the amendment contained in the appropriation act of October 19, 1888, Congress, in authorizing the Secretary of the Treasury to cause immigrants who are allowed to land contrary to the prohibition to be deported within the period of one year next thereafter, did not intend that such authority should extend to the deportation within that period of all persons who should be allowed to land in contravention of the provisions of the original act as amended. Such, substantially, was the condition of legislation touching the immigration or importation into the United States of persons other than Chinese at the time of the passage of the act of March 3, 1891, entitled "An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor." Act March 3, 1891, c. 551, 26 Stat. 1084 [U. S. Comp. St. 1901, p. 1294]. In the case of In re Martorelli (C. C.) 63 Fed. 437, Judge Lacombe held that the above legislation in force when the act of March 3, 1891, was passed, referred "to aliens who are imported into or who migrate to this country, not to persons already resident here, who temporarily depart and return." Section 1 of that act provided that:

"The following classes of aliens shall be excluded from admission into the United States, in accordance with the existing acts regulating immigration, other than those concerning Chinese laborers: All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease," &c.

Section 10 provided that:

"All aliens who may unlawfully come to the United States shall, if practicable, be immediately sent back on the vessel by which they were brought in."

The act, save in section 8, nowhere mentioned "alien immigrants" or "immigrants." But that section provided:

"That upon the arrival by water at any place within the United States of any alien immigrants it shall be the duty of the commanding officer and the agents of the steam or sailing vessel by which they came to report the name, nationality, last residence, and destination of every such alien, before any of them are landed, to the proper inspection officers, who shall thereupon go or send competent assistants on board such vessel and there inspect all such aliens, or the inspection officers may order a temporary removal of such aliens for examination at a designated time and place, and then and there detain them until a thorough inspection is made. * * * During such inspection after temporary removal the superintendent shall cause such aliens to be properly housed, fed, and cared for, and also, in his discretion, such as are delayed in proceeding to their destination after inspection. All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury. It shall be the duty of the aforesaid officers and agents of such vessel to adopt due precautions to prevent the landing of any alien immigrant at any place or time other than that designated by the inspection officers," &c.

152 F.—23

We deem it clear that all "classes of aliens," whatever may be the meaning of the phrase, enumerated in section 1 were on arriving by water in this country intended by Congress to be reported in "name, nationality, last residence, and destination," to the proper inspection officers at the port of arrival, and to be subject to inspection, examination and detention, and to the decision of the inspection officers or their assistants touching the right to land. But section 8 exclusively provided for such procedure and expressly referred to the aliens subject to its provisions as "alien immigrants." Thus, taking the act of March 3, 1891, as a whole, the generality of the phrase "classes of aliens" as employed in section 1 must be restricted to classes of alien immigrants. Accordingly it was held by Judge Benedict in the case of In re Panzara (D. C.) 51 Fed. 275, arising under the act of March 3, 1891, that certain aliens, assumed to be Italians, having their domicil in the United States, though not naturalized, who went to Italy on a visit with the intention of returning to their homes in this country, could not on their return be treated as alien immigrants, and did not come within the provisions of the legislation then in force authorizing deportation. He said:

"From the testimony it appears in respect to such petitioner that he is not an alien immigrant, but a resident of the United States; that when detained by order of the superintendent of immigration he was on his way from Italy to his place of abode in the United States; and that his voyage to Italy was undertaken with intent to return to the United States, where he resided. Upon this testimony it must be held to have been shown in regard to each petitioner that he was not an alien immigrant; and, that fact appearing, even if it be assumed that the petitioner was born in Italy, and had never been naturalized, it must nevertheless be held that the order of the superintendent of immigration set up in the master's return is void for want of jurisdiction. The statute conferring power upon the superintendent of immigration to order the return of persons arriving in the United States from foreign countries confines his power to alien immigrants. He has no jurisdiction to direct the return to a foreign country of a person not an alien immigrant."

So, in the case of In re Maiola (C. C.) 67 Fed. 114, Judge Lacombe held that the statutes relating to the exclusion of alien contract laborers, including the act of March 3, 1891, did not nor did any of them apply to an Italian residing in the United States and returning here after a temporary absence abroad. In Gonzales v. Williams, 192 U. S. 1, 24 Sup. Ct. 177, 48 L. Ed. 317, it was held that Isabella Gonzales, a citizen and native of Porto Rico, arriving from that island at a port of the United States, was not an alien immigrant within the meaning of the act of March 3, 1891. She had been detained as such by a commissioner of immigration for deportation, and the case turned upon the applicability to her of the term "alien." But Mr. Chief Justice Fuller, in delivering the opinion of the court said:

"If she was not an alien immigrant within the intent and meaning of the act of Congress entitled 'An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor,' approved March 3, 1891, 26 Stat. 1084, c. 551 [U. S. Comp. St. 1901, p. 1294], the commissioner had no power to detain or deport her, and the final order of the Circuit Court must be reversed."

The appropriation act of August 18, 1894, 28 Stat. 390, c. 301 [U. S. Comp. St. 1901, p. 1303], provided:

"In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of the Treasury."

Judge Lacombe, in the case of In re Monaco (C. C.) 86 Fed. 117, held that this clause did not exclude the jurisdiction of the courts in habeas corpus proceedings, where the alien is deprived of all opportunity to have his case heard on appeal to the Secretary of the Treasury. He said, among other things, with respect to the above provision:

"When it is remembered that this section took away from the courts the power to determine upon habeas corpus whether the alien was in fact an immigrant, and as such within the operation of the exclusion acts, it is the most natural construction of this language to hold that it gave the alien the right to have that important question passed upon by the Secretary of the Treasury. If the statements of petitioners' counsel are correct, this is a case in which a review somewhere should be allowed; for he asserts that the physician who at first reported that the immigrants were suffering from a loathsome contagious disease has modified his diagnosis. And upon the facts as asserted by petitioners, and not contradicted, two of the aliens are not immigrants; they have been domiciled here ten years, and are now returning after a brief absence."

In the case of In re Ota (D. C.) 96 Fed. 487, Judge De Haven said:

"It appears very clearly from these facts that Ota is not an alien immigrant, and the commissioner of immigration and the Secretary of the Treasury, if the same facts were before those officers, erred in ordering him to be returned to Japan as such. The act of March 3, 1891, c. 551, 26 Stat. 1024 [U. S. Comp. St. 1901, p. 1294], under which the order for the deportation of Ota is admitted to be justified, does not apply to aliens domiciled in this country, and who are returning thereto after a temporary absence."

He, however, held that the order of deportation, having on appeal been affirmed by the Secretary of the Treasury, was final. In Moffitt v. United States, 128 Fed. 375, 63 C. C. A. 117, the circuit court of appeals for the ninth circuit had occasion to consider section 10 of the act of March 3, 1891, providing for the deportation of "all aliens who may unlawfully come to the United States," and held that:

"This act clearly relates to immigration, and is leveled only against immigrants, although neither of those words is expressly mentioned in section 10 of the act."

The act of March 3, 1893, entitled "An act to facilitate the enforcement of the immigration and contract-labor laws of the United States" (Act March 3, 1893, c. 206, 27 Stat. 569 [U. S. Comp. St. 1901, p. 1300]) in some respects amended and added to the then existing legislation touching the importation of aliens other than Chinese into this country. This act clearly related only to immigrants and was wholly inapplicable to such a case as that of Buchsbaum. Its importance in this connection consists in the fact that it serves to indicate the general policy of Congress on the subject. The act of March 3, 1903, must, we think, in the light of antecedent legislation, to a portion of which reference has been made, be held to authorize deportation of aliens arriving by water in the United States only when they are at the time of their arrival "immigrants." Had Congress contemplated such a radical departure from the policy embodied in the earlier statutes touching importation of aliens

as to provide for their exclusion although not immigrant, but domiciled in this country, it is reasonable to assume that such intent, in view of such abrupt change of policy, would have been plainly expressed in the body of the act, and also that a title other than "An Act to regulate the immigration of aliens into the United States" would have been adopted. The counsel for the appellant Rodgers lay much stress upon Lem Moon Sing v. United States, 158 U. S. 538, 15 Sup. Ct. 967, 39 L. Ed. 1082. It was there held that an application for the writ of habeas corpus on behalf of a Chinese merchant domiciled but not naturalized in the United States, who on his return to this country from a temporary visit to China was not permitted to land, but was detained by a collector of customs for deportation, must be denied under the act of August 18, 1894, c. 301, 28 Stat. 390 [U. S. Comp. St. 1901, p. 1303] which provides that in such a case "the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of the Treasury." In that case the point decided was the finality of the decision by the collector of customs, and not the question whether the Chinaman, aside from such decision, had a right to re-enter the United States. Mr. Justice Harlan, in delivering the opinion of the court, said:

"He cannot, by reason merely of his domicil in the United States for purposes of business, demand that his claim to reenter this country by virtue of some statute or treaty, shall be determined ultimately, if not in the first instance, by the courts of the United States, rather than exclusively and finally, in every instance, by executive officers charged by an act of Congress with the duty of executing the will of the political department of the government in respect of a matter wholly political in its character. * * * To avoid misapprehension, it is proper to say that the court does not now express any opinion upon the question whether, under the facts stated in the application for the writ of habeas corpus, Lem Moon Sing was entitled, of right, under some law or treaty, to reenter the United States. We mean only to decide that that question has been constitutionally committed by Congress to named officers of the executive department of the government for final determination."

Lem Moon Sing v. United States lends no support to the contention of the appellants and is inapplicable to the case of Buchsbaum; for, not having been informed of his right to appeal, and not having appealed, and having been taken away from the port of arrival, the decision of the board of special inquiry, as before stated, was not final. We are satisfied that Buchsbaum was not an alien immigrant at the time of his arrival at Boston, and that, not being an immigrant, he was not liable to deportation under the provisions of the act of March 3, 1903, or any other statute of the United States. We are not aware of any decision in conflict with this conclusion.

The order of the court below discharging him must, therefore, be affirmed, with costs, and it is so ordered.